Good morning, Your Honor. Good morning. I'm trying to get directly to the point as the petitioner's prior counsel, who unfortunately is now deceased, ably stated in his brief, the immigration judge, in evaluating the credibility of the respondent, made a significant error of law and unfortunately mischaracterized the evidence. In the first instance, it appears to be clear that the immigration judge improperly based his negative credibility determination on the respondent's manner of entry. This is a primary factor of the decision and it goes against the weight of Ninth Circuit authority. It's clear that although it may be a violation of immigration law, an illegal entry or making false statements does not necessarily detract from an asylum applicant's credibility. It's clear that the immigration But he said that he came in to seek asylum and he was familiar with the asylum laws. Now, if he was coming in for purposes of seeking asylum, I think what the IJ was saying, was he or she or whatever, that if he wouldn't sneak in that way with a bunch of other people from Mexico, he would come in and ask for asylum. And so it was found him less credible for that. What's wrong with that? If he had a fear of persecution, especially a fear of death or harm, although he may have intended to seek asylum after arriving in the United States, he may have had such a fear of deportation back to the country where he feared persecution that he made when he attempted entry illegally. All right. So first of all, where is it in the record? And you may not know because if you've come on the case lately, so maybe the government lawyer can tell me. But I actually could not find in the transcript a statement where he actually said, I'm familiar with asylum law and I came here to seek asylum. Do you know where that is? Pardon? Where does it actually say? I didn't know the IJ said he said that he was familiar with asylum law and that's why he was coming. But I didn't actually see that in the transcript where he said that. He said something about, you know, I came to the United States because, you know, I know you're very humanitarian and you'd be nice to me or something like that, but nothing more specific. I didn't think about it. Maybe I'll ask that to the government. So the next question is, did anybody ever say to him during the hearing that there was a problem and why did he come across, why did he come that way? Did anybody ever ask him that question? I don't think so. And I don't think it's clear from the record that he was familiar with asylum law. I don't see anything in the record that would specifically question as to why he entered illegally if he came with the intention of applying for asylum. I would point out to the court that there have been several Ninth Circuit cases that have distinguished between making false statements to immigration officers in an attempt to obtain illegal entry and between the situation where false statements are made in the asylum application itself. Pardon me, the spelling may not be correct. It's a case I looked up last night. Otkin-Minney v. INS 196, 3rd, 951, Ninth Circuit, 1999. This case distinguished between that type of situation. Misrepresentations to obtain entry is distinguished from misrepresentation in the asylum application itself. I'd also like to cite from the immigration judge's decision on page 58 of the record, it is established that method and mode of entry, matters that relate to an alien's professed motivation for coming to the United States, are not ancillary to an asylum claim but rather essential to it. Okay, the problem regarding the credibility issue is the alien may have been so afraid of persecution and of deportation that he entered the United States illegally and then may have been intended to apply for asylum after his entry. Although it's a violation of immigration law, illegal entry and false statements to obtain entry do not necessarily detract from the credibility of the state prosecution. Let me ask you about my ultimate concern here. All right, my ultimate concern. I'm sorry? I understand that. And I do have many problems with the I.J.'s various credibility findings in terms of what's in the record. However, and this is my ultimate question, ultimately he relied on demeanor, or at least in part he relied on demeanor. And it is hard reading this transcript not to become as frustrated as everybody else was with the petitioner, and there are explanations for that that are offered and so on. But my question is, can we – he certainly was at times unresponsive. And it's hard to fault that finding. So suppose that was the only one we could sustain. Does the petitioner win or lose at that point? Okay. In other words, suppose I concluded that all of the reasons that were given for contradictions and so on don't hold up, but that the I.J. certainly had reason to think that at the hearing itself, the petitioner appeared unresponsive, perhaps memorizing his story, and that that was a valid observation. Then what? What do I do as a court of appeals? Does he win – does your client win or does he lose? If everything else – if I threw everything else out, but I upheld the demeanor conclusion. The immigration judge did not find that the testimony was fabricated or fraudulent. Well, what does that mean then? If it's not fabricated or fraudulent, but it's not true? There may have been other explanations for his unresponsiveness other than an attempt to give untruth. There were psychological evaluations prepared to the petitioner regarding his traumatic experience. He didn't knowingly lie. Right. There was no finding of that nature. Yeah, yeah. There's no finding knowingly, but that the story doesn't hang together. And I've – the story is a little difficult to follow, his story. I think there are other areas where the immigration judge mischaracterized either or based his conclusions on speculation that was not in the evidence. For example, the immigration judge on several occasions in the record speculated that the petitioner, number one, was involved in the military wing of the Christian militia. He testified very clearly that he was only employed by them as a painter, but for some reason the immigration judge felt he had a more active role. Number two, the immigration judge speculated that he may have been involved in the persecution of others. I found no evidence of that in the record. In regard to the petitioner's two brothers, who were fighters in the Christian militia, there's no evidence that the other two brothers were involved in the persecution of others. Excuse me. I don't think that answers Judge Berzon's question, because we're supposed to give special deference to the I.J.'s demeanor testimony. So let's assume we agreed with you on all of these inconsistencies the I.J. identified were not really supported by the record. Don't we still have to give deference to the I.J.'s demeanor determination, and based on that, that constitutes substantial evidence to support his adverse credibility determination? Of course the immigration judge is entitled to observe and evaluate the witness according to his demeanor, but his conclusions must be based upon facts in the record, not speculation, and the facts in the record must be correctly characterized. It must be based on some facts in the record. It can't just be simply conjecture. There was an expert witness who testified regarding the facts of the asylum claim. He stated that it was not improbable, and in light of country conditions, the asylum claim was credible. This is another instance in which the immigration judge did not accurately characterize the testimony of the expert witness. The immigration judge felt that he concluded the expert witness had stated that the petitioner felt he was persecuted because of his involvement with the Christian militia. The witness had actually testified that he was detained and beaten because of the persecutor's perceived involvement in the Christian militia. The expert witness never testified that he had any militia involvement or any involvement with the Christian forces other than his occupation as a painter. All right. This is one of several problems with this nature. Right. You have more than used your time. Are there any other questions of the petitioner? All right.  Your time has expired. We'll hear from the government. It would be helpful if you could answer my question about where in the record he actually said what the IG said he said about being familiar with asylum and coming for asylum. Absolutely, Your Honor. On page 818 of the record, which is the petitioner's asylum application, the asylum application itself had a declaration attached, and that declaration stated, and that is on page 818, quote, I know of the asylum program in the U.S. whereby it allows for people who are threatened in their home countries on account of their religion and political opinion an asylee status, unquote. So that doesn't demonstrate what the I.J. relied on it for, which is that he knew before he came and he came here for that purpose. Well, in the petitioner's asylum application, he is stating that he knew of the U.S. asylum laws. He said I know. He didn't say I knew. I'm sorry? It says I know, not I knew. Yes, that's true. He says I know. And then in his testimony in his hearing, he stated his goal, quote, my goal was to enter the U.S. because I know it had the respect for human beings. Right. And so there's no support for the notion that he had knowledge of the asylum program in any way except this vague notion that the U.S. would be nice to him. Well, the judge from that testimony and from the asylum application, the judge concluded that the petitioner's law … Erroneously, as far as I could tell. There's just no support for it. The agency's position is that when he said I know of the asylum program in the context of his declaration, he meant that he came … The declaration was filed when he was filing for asylum. So at that point he knew, obviously. That's correct. That's absolutely correct. What does the record say about his reason for coming in? Is there any evidence in the record as to why he came in with this group of Mexicans? Well, there's testimony stating that, and I believe it's also in his declaration, that he basically had had enough in Lebanon and that is when he devised the plan or decided to leave the country. He doesn't speak precisely to why he went through Mexico or why he entered with that particular group of people. And no one asked him either, right? That was not asked of him, no. All right. So the whole notion that there was something peculiar about this decision because he somehow knew that he could just go to an airport and declare asylum just has no support. Well, beyond the manner of entry per se, his behavior when he was apprehended, excuse me, led the judge to conclude that the petitioner may be hiding something about his very identity or hiding or misrepresenting that he was really a member of a persecuted group. If you recall, when he was apprehended, he was interviewed by a border officer with an Arabic interpreter. And at that time, the petitioner became agitated and refused to answer questions regarding his family's names, things that don't go to the details of persecution but things that go to his very identity. And that evasiveness, nonresponsiveness seemed to contradict the intention to enter the United States to seek protection. And also that behavior followed petitioner through his hearings and his testimony when the judge and the attorneys saw him get agitated on several occasions, provide nonresponsive answers, et cetera. So in this case, it wasn't the manner of entry per se, but the manner of entry coupled with his behavior when he got to the United States and his behavior when he was- When was he picked up in relation to the entry? Do we know? It was within 24 hours. And he applied for asylum? Once he was in removal proceedings. So no affirmative, but the NTA was served, the notice to appear, I'm sorry, it was served shortly thereafter. And then he filed for asylum in the proceedings. And he never got a job or- did he have a job in this country or- The record does not show- It doesn't show that he did, and he didn't put any proof that he did. That's correct. At one point in the middle of the hearing, I think he said something like, I want to get a work permit- in the middle of the early hearings, I want to get a work permit, and they said, well, you have to apply for it. Exactly. But there's no evidence that he had a job in the U.S. I mean, I guess I said earlier what I thought, which is I really think that each of the I.J.'s determinations as you go through them are hard to substantiate. And therefore, to me, it comes down to the credibility issue. I mean, for example, the record seems fairly clear, I mean, quite clear, it seems to me, that he was saying consistently, I didn't fight, I was a painter. And it was nonetheless found to be contradictory about that. Well, Your Honor, in the record, there are, as you said, instances where he said- Many instances. And at one point, they say something like, were you with them? And he says, yes. And then he explains in the next sentence what he meant by that. So it's just not a fair reading of the record. Well, Your Honor, to give more information on that point, his own attorney asked him, why would the Syrian forces target you if you were just a painter and not a fighter in the militia? And in response to that question, Petitioner stated that he was in the forces and asked for clarification by his attorney. He said he was, quote, fighting Islam, end quote. And that's on page 276 of the record. Well, it doesn't seem very odd to say that if you're in the Army being a, you know, a noncombat person, that you're in the Army and that somebody who didn't like the Army wouldn't like you. Well, then that could be one interpretation. But then the attorney, his own attorney, asked him, did you actually fight with the militia? And Petitioner stated, quote, yes, of course, I was with them, end quote. And what's the next sentence? The next question is something to the effect of where he explains it. And it just didn't hold up for me. Well, his attorney then states, you didn't answer me. You still didn't answer me clearly. I understand you were with them. But did you, she says, did you actually hold arms and go fight? And he starts then on an evasive, nonresponsive line of answering and says, I, there was a kind of department, it's called the Coptic, and then that's when the judge interrupts him and says, you're being, warns him of, I think, the first time of being evasive and not providing a response. But ultimately the question is, if the evasiveness point is true, is that itself sufficient to uphold the determination? We feel, Your Honor, that it is. This Court has determined that it is bound to accept an adverse credibility finding when just one of the identified grounds is supported by substantial evidence and goes to the heart of the claim. And Petitioner's, and that's from Lee v. Ashcroft. And in this case, there were several reasons, but as you said, the demeanor runs throughout the case and throughout all of this. It's a funny, I mean, if that's really the rule, it's an odd rule because the I.J. here gave lots of reasons. He obviously didn't think the demeanor alone was enough because he gave lots of reasons. He didn't say, if the only thing was the demeanor, I wouldn't have believed him. He never said that. He gave, and if we thought all the other reasons were really not substantiated, then how do we know what the I.J. would have found if he didn't rely on all those other reasons? Well, we just, we do know that the judge found there to be many reasons for his adverse credibility. Right. And one of those reasons was the evasiveness and the demeanor. And we can't, I can't speculate as to what the I.J. would have done. Exactly. So how can we uphold him on that basis? Because the evasiveness enough under Ninth Circuit case law is enough to support an adverse credibility determination. And I think the point here is that the But doesn't that completely undermine the difference due to an I.J.? Because we are now upholding him on a basis that wasn't the basis on which he found it, because he found an aggregate. And we're now separating out one thing out of ten and saying, well, that's enough and we have no clue what he would have done, so he might have done otherwise. Well, I mean, Your Honor is correct in the sense that we don't know what he would have done. But in this case, he found all of those reasons. And he found several reasons, articulated all of those reasons, and the evasiveness was just one. And I think it's important to point out here that the judge just simply didn't know what to believe on certain key points. He gave the Petitioner every opportunity to explain certain inconsistencies, discrepancies, nonresponsive answers. At one point, Petitioner's own counsel asked the judge to instruct the witness, to instruct the Petitioner. It's clearly maddening. But the real question, I suppose, the question is whether somebody with psychological problems doesn't get asylum because he can't tell a straight story. Well, we do recognize that there were documents in the record establishing or stating that Petitioner suffered from PTSD, post-traumatic stress disorder, in addition to other emotional issues or problems. However, Petitioner's those documents also state that Petitioner had no impairment to understanding, no impairment to communicating or expressing himself, and that he was alert and that he was of fair judgment and that he was of average intelligence. So while those documents say he had PTSD, the same documents from the psychiatrist also undercut the PTSD being a basis for these evasive and problems with the demeanor. The psychiatrist said he does suffer from these things and he should get some therapy. However, he has no impairment to testifying, or he didn't use the word testifying, he used no impairment to expressing himself, no impairment to understanding. And that can be found at page 432, I believe, in the record. Yes, 432 and then also at 632 is the other letter from the psychiatrist. So this judge recognized that there could be an issue of competency, but that the Petitioner himself submitted documents that established he was competent to testify and that he had no impairment to his ability to testify. What was his, what do you understand of his theory for why he was going to be persecuted? Was it because he was Christian, because he was an agent of Israel? Was it because, that I couldn't understand his theory. There seems to be many reasons, but his reason for seeking asylum from Egypt seems to be a combination of his Coptic Christian faith and the fact that his family had all of these problems that seemed to start with his brother, Abraham, being forcibly converted, allegedly forcibly converted to Islam. Did that happen in Lebanon? It happened in Egypt. Egypt allegedly forced Abraham to convert to Islam. And then when Abraham went to Lebanon with the help of Petitioner, he reconverted back to Christianity. And that incident is one of the bases of fear for Petitioner. But he also said that when he was captured or questioned in Egypt and detained that they accused him of being an agent of Israel and a spy with the Lebanese Christian militia and some of those issues as well. Petitioner seeks asylum from Lebanon based on his affiliation with the Lebanese Christian militia. However, the judge couldn't determine exactly what that involvement was. All right. Thank you. Are there any questions of Petitioner's counsel? No. All right. Thank you. Thank you very much. The case just argued is submitted for decision. We'll hear the next case, which is United States v. Paulus Marcus.
judges: Schroeder, Berzon, Ikuta